George MOROSANI, Individually and on behalf of all other persons similarly situated

v.

The FIRST NATIONAL BANK OF ATLANTA.

Civ. No. C81–1553.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 23, 1984.

Robert B. Remar, Jonathan A. Zimring, Remar, Arnold & Zimring, Jerome J. Froelich, Jr., Kenneth P. McDuffie, Atlanta, Ga., for plaintiff Kleiner.

Jerome J. Froelich, Jr., Kenneth P. McDuffie, Atlanta, Ga., Michael P. Mala-

koff, Pittsburgh, Pa., for plaintiff Morosani.

Trammel E. Vickery, Kent Mast, William B.B. Smith, James A. Gilbert, Hansell, Post, Brandon & Dorsey, C.B. Rogers, Rogers & Hardin, Atlanta, Ga., for First National Bank of Atlanta.

## ORDER

ORINDA D. EVANS, District Judge.

This action is before the Court on Defendant's Motion to Dismiss First and Second Counts of the Complaint.

### I. *Background*

Plaintiff Morosani is a former borrower of Defendant The First National Bank of Atlanta. His note called for interest payments tied to the Bank's "prime rate," calculated on a "360-day year simple interest basis." Morosani claims the Bank fraudulently overcharged interest on his loan. He claims these overcharges were collected through the device of false interest statements, which were mailed to him periodically. In the First and Second counts of his Complaint, he alleges violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*[1] Both counts seek treble damages under § 1964(c) of RICO, *i.e.*, three times the amount of the claimed overpayments.

On December 1, 1981, this court granted the Bank's initial motion to dismiss the RICO claims for failure to state a claim. It found that Plaintiff had failed to allege the pendency of a criminal charge or the likelihood of a future criminal prosecution. *Morosani v. First National Bank of Atlanta*, No. C81–1553 (N.D.Ga. Dec. 1, 1981), *incorporating by reference, Kleiner v. First National Bank of Atlanta*, 526 F.Supp. 1019, 1022 (N.D.Ga.1981). An interlocutory appeal was taken after certification of the Order pursuant to 28 U.S.C.

---

1. Count I asserts that although the note called for interest to accrue at the rate of 2½% per annum "plus the 'prime rate' currently charged from time to time by Payee to its best and most credit worthy commercial customers" (quota-

tion marks around "prime rate" in original) that a higher rate in fact was charged. Count II asserts that interest was not charged on a "360 day year simple interest basis" but rather on a basis less favorable to Morosani.

§ 1292(b). The Court of Appeals reversed, stating:

> Plaintiff's complaint alleged that the Bank had engaged in a scheme to obtain money by means of false or fraudulent pretenses and representations. Obtaining money by false pretenses, if proved, clearly falls within the traditional definition of criminal activity and is specifically prohibited by 18 U.S.C.A. § 1341 (West Supp.1982) when, as alleged here, the services of the U.S. Postal Service are used to further the alleged scheme. Thus, we reject the theory upon which the district court dismissed Counts 1 and 2 of plaintiff's complaint.

*Morosani v. First National Bank of Atlanta,* 703 F.2d 1220, 1222 (11th Cir.1983) (per curiam) (footnotes omitted).

Although the Bank had presented alternative grounds in support of dismissal of the RICO claims, the circuit court declined to consider them, noting that they had not been considered first by the trial court. In the instant motion to dismiss, the Bank now seeks a ruling on these additional grounds.

## II. *Discussion*

### A. Relevant Allegations of the Complaint

Morosani sues under § 1964(c), which creates a private right of action for treble damages. That section provides:

---

**2.** The full text of § 1962(c) is:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**3.** The terms "person," "enterprise," "racketeering activity," and "pattern of racketeering activity" are defined terms under § 1961 of RICO as follows:

> (1) "Racketeering activity" means ... (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud) ...;

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Section 1962 of RICO is divided into subsections (a)–(d). Each subsection creates a different criminal offense. The Complaint's RICO counts seek damages for violations of 18 U.S.C. § 1962(c), which makes it "unlawful for any person ... associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity...."[2]

Restating Morosani's factual allegations within RICO's definitional framework,[3] he is alleging that a "person" (the Bank), which is associated with an "enterprise" (the Bank and its holding company), conducts or participates in the conduct of the enterprise's affairs through a pattern of racketeering activity (*i.e.,* two or more acts of mail fraud) directed toward him and other borrowers of the Bank. Morosani is alleging that as the victim of mail fraud, he has suffered private injury from a § 1962(c) criminal violation, which is compensable under § 1964(c).

### B. Plaintiff's alleged lack of standing

In the first two sections of its brief, the Bank argues that Morosani lacks standing

---

＊　＊　＊　＊　＊　＊

> (3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;
>
> (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
>
> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]

or has failed to state claim for which relief can be granted because (1) he has not alleged injury of a character RICO—specifically § 1962(c)—was intended to redress, and (2) he has failed to allege injury or damages flowing from that which makes the Bank's alleged conduct unlawful under § 1962(c). Because these arguments are interrelated, they will be treated together.

(1) *The propriety of invoking standing requirements in § 1964(c) cases*

The first question which must be addressed is whether standing requirements may properly play any part in civil damage suits by private litigants under RICO. For the reasons herein stated, the court determines that *certain* standing requirements may be applied in such cases.

■ Section 4 of the Clayton Act,[4] 38 Stat. 731, *as amended* 96 Stat.1964, 15 U.S.C. § 15, served as a model for the drafters of § 1964(c), RICO's treble damages section. In interpreting § 4, courts have developed a so-called "standing doctrine" which consists of a loose set of requirements, or concepts, which limit the universe of plaintiffs who may seek treble damages for private injury stemming from violation of the antitrust laws' criminal provisions. Such requirements screen out cases where the link between the antitrust violation and the private injury is deemed too remote or where, as a matter of law, there is no causal link. 2 Areeda & Turner, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 333 (1978); Sullivan, Antitrust § 247 (1977); *see e.g., Robbins Flooring, Inc. v. Federal Floors, Inc.,* 445 F.Supp. 4, 11

(E.D.Pa.1977), *citing Hawaii v. Standard Oil Company of California,* 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972). Hence, it has been held that although a competitor of defendant has a treble damages claim for injury caused by defendant's anticompetitive practices, a supplier to the injured competitor lacks standing even though it may have been indirectly affected. 2 Areeda & Turner, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 340e, 341a–b and cases cited therein (1978); Sullivan, Antitrust § 247 (1977); *see, e.g., Volasco Products Company v. Lloyd A. Fry Roofing Company,* 308 F.2d 383 (6th Cir.1962), *cert. denied,* 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); *Lieberthal v. North Country Lanes, Inc.,* 221 F.Supp. 685 (S.D.N.Y.1963), *aff'd,* 332 F.2d 269 (2nd Cir.1964). Similarly, Plaintiff lacks standing where his injury is determined not to flow from "that which makes [the] defendant['s] acts unlawful." *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

Another limiting concept under § 4 which has been denominated a standing requirement is the requirement that plaintiff's injury be "of the type the antitrust laws were intended to prevent." *Id.* For a summary of standing doctrine under § 4 of the Clayton Act, *see* 2 Areeda & Turner, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 334a (1978).[5]

■ The court agrees with the Bank that it is appropriate to recognize two standing

---

**4.** Section 4 of the Clayton Act, at the time RICO was passed, provided as follows:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15. This section was amended in 1980 to include provisions regarding awards of prejudgment interest.

**5.** These standing requirements have not consistently met with judicial approval, *see, e.g., Radovich v. National Football League,* 352 U.S. 445, 454, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957) ("Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those [antitrust] laws"). *But see Hawaii v. Standard Oil Company of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).

requirements in RICO cases which have been applied in cases under § 4 of the Clayton Act. Those two standing requirements are: (1) the requirement that Plaintiffs' injury be of a type the criminal statute was intended to prevent and (2) the requirement that Plaintiffs' injury flow from that which makes Defendant's conduct unlawful.

■ Application of these two standing requirements in a RICO setting is appropriate for the same reasons said application is appropriate in cases under § 4 of the Clayton Act. Both § 4 of the Clayton Act and § 1964(c) of RICO make private injury by reason of underlying criminal acts compensable, without defining the term "injury." In both cases, the underlying criminal offenses are broadly defined.[6] RICO crimes, like antitrust crimes, are malum prohibitum offenses. There is no guiding common law tradition. Resort to legislative history is therefore of critical importance in determining the purpose and scope of the statutes and ensuring that they are applied in a manner consistent with congressional intent. Under these circumstances, application of the referenced standing requirements is especially appropriate.

Moreover, the two standing requirements urged applicable by the Bank do not, unlike some of the standing requirements applicable in antitrust cases, seek to screen out claims which are deemed merely too remote or speculative to deserve engagement of the judicial machinery. The issue is congressional intent, not whether the court should screen out certain cases prior to trial for reasons of judicial economy or other policy reasons. Congress had certain purposes in mind in enacting RICO: it is the obligation of the court to interpret the legislation, taking into account the legislative history, to carry out congressional intent.

■ Having thus decided, the court turns now to the most basic part of the required analysis: what purpose(s) did Congress intend to serve in enacting the underlying criminal statute at issue here, § 1962(c)? Put another way, what social evil(s) did Congress seek to address when it made criminal the conducting of an enterprise's affairs through a pattern of racketeering activity? It is recognized that Congress did not merely intend to punish commission of the underlying criminal acts (the "predicate acts") which make up the "pattern of racketeering activity." *United States v. Phillips*, 664 F.2d 971, 1011 (5th Cir.1981) (Unit B);[7] *Johnsen v. Rogers*, 551 F.Supp. 281 (C.D.Cal.1982). Obviously, in enacting RICO Congress was motivated to address one or more social evils which it felt had not been addressed otherwise in the law.

The most pertinent source for determining congressional intent in enacting RICO is the Congressional Statement of Findings and Purpose, Pub.L. 91–452, section 1, 84 Stat. 922, which provides in pertinent part as follows:

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the

---

**6.** This is especially true of the criminal provisions of the Sherman Act, *see* 15 U.S.C. §§ 1, 2, but it is also true of § 1962(c) of RICO.

**7.** The Eleventh Circuit adopted as binding precedent all of post-September 30, 1981 decisions of a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982).

stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

It is the purpose of this Act [see Short Title note set out under this section] to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

In the court's opinion, the foregoing evidences congressional concern about two social harms which it found to be associated with organized crime, and which are arguably relevant in the instant case. The first is the economic distortion which occurs when an organization or its affairs are unlawfully manipulated. Such distortion could occur in cases involving either legitimate or corrupt organizations.[8] Depending on the factual context, it could impact on competitors or investors of the organization, or even on the organization itself.

The second social harm, which is pertinent only in cases involving corrupt organizations, is the enhancement of power which accrues to corrupt organizations through the conduct of illicit endeavors.[9]

Both of these legislative purposes are pertinent to § 1962(c) of RICO, which makes it a crime to conduct the affairs of an enterprise through a pattern of racketeering activity. First, § 1962(c) proscribes a racketeer's unlawful manipulation of the affairs of an organization. In the language of § 1962(c), this manipulation is termed "[conducting an] enterprise's affairs through a pattern of racketeering activity." Secondly, § 1962(c) proscribes a corrupt organization's enhancement of its power through the conduct of illicit endeavors. Again, in the language of § 1962(c), this enhancement occurs when a person "[conducts the] enterprise's affairs through a pattern of racketeering activity...."[10]

(2) *Application of a standing requirement that Plaintiff's injuries be of the type § 1964(c) was intended to prevent*

■ The court agrees with the Bank that requiring plaintiff to show that his injury is of a type § 1962(c) was intended to prevent is proper in a § 1964(c) RICO case based on a § 1962(c) violation. However, application of this standing requirement in this case does not result in dismissal of Morosani's claim.

The character of private injury flowing from violation of a criminal statute is a function of—and is defined by—the social harm addressed by the criminal statute. Because § 1962(c) addresses two social

---

**8.** Examples involving legitimate organizations are more easily visualized than those involving corrupt organizations. However, an example involving a corrupt organization would be where an organization is able to underprice and thereby harm a competitor by stealing raw materials used to fabricate the organization's products.

**9.** This duality is reflected in RICO's title itself: "Racketeer Influenced and Corrupt Organizations."

**10.** There is no need for the government in a criminal prosecution under § 1962(c) to identify which of these purposes are served in a given case. The first purpose is the broader of the two and is presumptively applicable in all cases. On the other hand, in a civil setting where plaintiff must prove injury it is quite important that the relevant purpose be identified so that it may be determined, among other things, whether plaintiff's alleged injury falls within the parameters of the social harm sought to be addressed by the underlying criminal statute.

harms, each must be examined in defining compensable private injury.

In the first class of cases (where plaintiff claims injury by reason of distortion of the enterprise's affairs), plaintiff's injury is only collaterally caused by the pattern of racketeering activity. His injury directly flows from the distortion of the enterprise's affairs which comes from use of racketeering methods. The particular way in which that distortion impacts on plaintiff—not the pattern of racketeering itself—defines the character of his injury and his measure of damages. The cause of action lies, not against the enterprise,[11] which may be entirely innocent of wrongdoing, but rather against the racketeer (*i.e.,* the "person" referred to in § 1962(c)) who has manipulated the enterprise's affairs to the plaintiff's disadvantage.

It is clear that Morosani does not claim his injury was caused by distortion of the affairs of the alleged enterprise. His complaint asserts that he had a borrower-lender relationship with the Bank. Even if Morosani's complaint were to allege (which it does not) that the Bank was the "enterprise" for purposes of § 1962(c), Morosani as borrower does not stand in a position to be impacted by distortion of the Bank's affairs. Morosani as borrower is indifferent to any such distortion.

In the second class of cases referred to above (where plaintiff is a victim of a corrupt enterprise's racketeering activity), plaintiff sustains injury simply as victim of one of the acts of racketeering activity. The perpetrator of the crime is the enterprise, which is presumptively benefitted and enhanced through the commission of the pattern of racketeering activity. All knowing members of the enterprise are subject to suit as defendants; in such a case each such member would qualify as the "person" referred to in § 1962(c).

The treble damages remedy in this second class of cases is not intended merely to compensate the victims of racketeering activity, however. It also serves the purpose of reducing the power of the corrupt organization—*i.e.,* the corrupt enterprise—by diminishing its economic viability. The term "corrupt enterprise" or "corrupt organization" is not defined in RICO, although RICO addresses the social harm caused by such organizations. *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). As a matter of common sense, it necessarily would be an enterprise in which the conduct of criminal activity is a significant objective.

The complaint clearly alleges that Morosani has sustained injury as the claimed victim of a crime which was part of an alleged pattern of racketeering activity. Since such an injury may, in certain cases, be compensable under § 1964(c), the character of Morosani's alleged injury does not deprive him of standing.[12]

(3) *Application of a standing requirement that there be a causal link between Plaintiff's injury/damages and the basis for the alleged § 1962(c) violation*

■ Although the Bank's character-of-injury standing argument fails based on the foregoing analysis, the fate of its alternative argument is uncertain. The alternative argument—that there is no causal link between Morosani's claimed injury/damages and the claimed basis for the alleged § 1962(c) violation cannot conclusively be

---

**11.** However, there may be cases where the enterprise is also the "person" referred to in § 1962. In these cases a cause of action would lie against the enterprise in its capacity as such "person." *See United States v. Hartley,* 678 F.2d 961 (11th Cir.1982) (holding that corporation could simultaneously be the defendant and the enterprise).

**12.** The court rejects the Bank's argument that § 1964(c)'s reference to injury to "business or property" reflects congressional intent to limit recovery to those who have suffered commercial injury. The same language in § 4 of the Clayton Act has been held to cover consumer injuries which in a state law context would be considered injuries to the person. *Reiter v. Sonotone Corporation,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (allowing cause of action to consumers who had paid a higher price because of defendant's alleged price fixing).

accepted or rejected based on the present record.

As is explained hereinafter, the court holds that a victim of a RICO "predicate act" has standing to seek treble damages under § 1964(c) for injury caused by a § 1962(c) violation, but only where the predicate act is committed in pursuance of the affairs of a criminal enterprise. Whether Morosani is alleging that the claimed enterprise consisting of the Bank and its holding company was a criminal enterprise is presently unclear. Therefore, a ruling on the Bank's alternative standing argument is deferred pending a hearing.

The Bank's alternative argument is based on a principle set forth in *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). *Brunswick* was an antitrust action brought, in part, for treble damages under § 4 of the Clayton Act. Plaintiffs were bowling centers which complained of defendant's anticompetitive acquisition of certain of plaintiffs' competitors. Defendant was a major manufacturer of bowling equipment and the largest nationwide operator of bowling centers. It had sold bowling equipment to the referenced competitors of plaintiffs. When they defaulted on their equipment leases, defendant acquired their operations in satisfaction of their obligations and continued operating them.

Plaintiff bowling centers sought damages on a lost-profits theory. Their premise was that if the acquisitions had not occurred, there would have been an increase in their profits because the competing bowling centers would have closed down rather than being continued in operation.

The Supreme Court reversed a judgment awarding treble damages to plaintiffs, finding that they had failed to allege "injury of the type the antitrust laws were intended to prevent *and that flows from that which makes defendants' acts unlawful." Id.* at 489, 97 S.Ct. at 697 (emphasis added). It noted that even if the acquisitions were anticompetitive and thus illegal, plaintiffs' claimed lost profits were not attributable to any anticompetitive effect of the acquisitions. Plaintiffs' lost profits would have been the same if someone other than defendant had taken over the competing bowling centers. In short, plaintiffs' theory of damages did not "link up" with the basis for the claimed violation.

Thus, *Brunswick* holds that in some cases the absence of causal link between plaintiff's alleged injury/damages and the theoretical basis for making the conduct unlawful may obviate the need to submit the claim to the trier of fact.

As previously stated, Morosani is only asserting an injury allegedly sustained by him as the victim of mail fraud—the "racketeering activity." Therefore, if he seeks to posit the Bank's liability on its improper manipulation of the affairs of an enterprise, he would confront the same problem as did plaintiffs in the *Brunswick* case: the basis for the claimed violation does not "link up" with the claimed damages, and a § 1964(c) award would not serve a RICO purpose. If, on the other hand, Morosani's theory is that he was a victim of a criminal enterprise consisting of the Bank and its holding company, then his claim against the Bank as a member of that enterprise does "link up" with his claimed injury/damages. In that event (if Morosani's claims are factually proven at trial) a § 1964(c) award would serve a purpose contemplated by the drafters of § 1962(c): striking at the economic viability of a criminal enterprise.

In light of the generality of Morosani's Complaint, the court cannot isolate the claimed theoretical basis for the Bank's liability.

Under these circumstances, the court would normally deny Defendant's motion to dismiss outright. Nonetheless, the court recognizes that a civil RICO suit unaccompanied by criminal process is unique in certain respects. Civil RICO is a vehicle whereby a person may be charged, in effect, with being a criminal and brought to trial without the safeguards normally associated with criminal process. In the instant case, no indictment or information has been filed; no arrest warrant has been taken out

upon a finding of probable cause pursuant to Rule 4(b), Fed.R.Crim.P.; indeed, there has not even been a sworn complaint filed under Rule 3, Fed.R.Crim.P., which would afford the defendant appropriate recourse were the claimed RICO violations adjudged malicious and frivolous. Therefore, the court elects to require Plaintiffs to amplify, at a hearing before the undersigned, the factual allegations of the complaint discussed herein which pertain to the workings of the alleged enterprise, including the following: (1) for what purpose or purposes Morosani claims the enterprise, consisting of the Bank and its holding company, was formed or maintained during the relevant period of time; (2) what the "affairs" of the enterprise consist of; (3) what part the Bank's holding company played in the affairs of the enterprise; (5) what relationship the alleged pattern of racketeering had to the enterprise's affairs as a whole. This hearing is hereby set for Thursday, March 22, 1984, at 2:00 p.m. Pending such hearing, the court DEFERS ruling on the Bank's argument that Morosani lacks standing to assert his treble damages claim or, alternatively, that he has failed to state a claim for the same reason.

### C. Association of Defendant with organized crime

■ Defendant next contends that Morosani must allege that the Bank is associated with organized crime in order to make out RICO claims. Although some courts have found that such a requirement exists,[13] the court concludes that there is no general requirement that a civil RICO plaintiff allege the defendant's connection to organized crime.

This court has recently had an opportunity to address this very issue. In *Taylor v. Bear Stearns & Co., et al.,* 572 F.Supp. 667 (N.D.Ga.1983), Judge Forrester rejected the argument that plaintiff's failure to allege that defendants are associated with

organized crime is fatal to a RICO claim, reasoning:

While the requirement of an affiliation with organized crime may appear to follow from the title of the provisions and the Act that contains them, and to result from the potential publicity that RICO actions attract and the consequent damage to a defendant's reputation, *see Barr [v. WUI/TAS, Inc.,]* 66 F.R.D. [109] at 112–13 [ (S.D.N.Y.1975) ] (court expresses concern about the "patently unfair" implication "that defendant is somehow involved in organized crime" that could arise from "[t]he mere granting of leave to file a [RICO] claim"), this court believes that the creation of an "organized crime" nexus requirement is improper. First, several representatives expressed fear that any attempt to define the concept of "organized crime" with precision would cast doubt on the statute's constitutionality. 116 Cong.Rec. 35, 293 (1970) (statement of Rep. Poff); *id.* at 35, 343–44 (statement of Rep. Cellar). While Representative Biaggi proposed an amendment that would have specifically criminalized membership in the Mafia or La Cosa Nostra, Congress rejected it. *Id.* at 35, 346.

Second, Congress did not want to reduce RICO's potency by imposing a burden of proof that would be practically impossible to meet. *See, e.g.,* 116 Cong. Rec. 586 (1970) (statement of Sen. McClellan) (organized criminals able to "insulate" themselves); *id.* at 601 (statement of Sen. Hruska) (difficulty in proving link between criminal group members and illicit activities they sponsor). In responding to criticism that RICO's provisions were over-inclusive, Senator McClellan, one of the sponsors of the bill, stated, "the Senate Report does not claim ... that the listed offenses are committed primarily by members of organized crime, only that those offenses are characteristic of organized crime." McClel-

---

**13.** *See Wagner, et al. v. Bear Stearns & Co., Inc., et al.,* [1982–1983 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 99,032, at 94,911 (N.D.Ill.1982); *Waterman Steamship Corp. v. Avondale Ship-yards, Inc.,* 527 F.Supp. 256 (E.D.La.1981); *Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736 (N.D.Ill.1981).

lan, *The Organized Crime Act (S. 30) or its Critics: Which Threatens Civil Liberties?*, 46 Notre Dame Law. 55, 142 (1972)....

\*    \*    \*    \*    \*    \*

Therefore, inasmuch as Congress explicitly rejected an affiliation with organized crime requirement as unworkable and possibly unconstitutional, and inasmuch as Congress has given statutory content to the notion of "organized crime" by utilizing a "pattern of racketeering activity" predicate for section 1962 violations, the court rejects defendants' argument that plaintiff's failure to allege that defendants are associated with organized crime is fatal to plaintiff's RICO claim.

572 F.Supp. at 681–682. *See also United States v. Uni Oil, Inc.*, 646 F.2d 946 (5th Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1254, 71 L.Ed.2d 446 (1982) (criminal suit).

This court adopts the analysis set forth above and therefore rejects Defendant's argument. In reaching this decision, the court follows the majority of courts who have also concluded that a RICO plaintiff need not allege Defendant's link to organized crime. *See, e.g., Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir.1983); *Schacht v. Brown*, 711 F.2d 1343 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983); *Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982), *reh'g. en banc*, 710 F.2d 1361 (8th Cir.1983); *Kimmel, et al. v. Peterson*, 565 F.Supp. 476 (E.D.Pa.1983); *Crocker National Bank v. Rockwell International Corporation*, 555 F.Supp. 47 (N.D.Cal.1982); *Hanna Mining Company v. Norcen Energy Resources Ltd.*, 574 F.Supp. 1172 (N.D.Ohio 1982).

D. The existence of an "enterprise" within the meaning of RICO

▇ Defendant asserts that because Plaintiff has not alleged a RICO "enterprise" which, according to Defendant, is either a single legal entity or a group of individuals associated in fact, the RICO claims should be dismissed.

Section 1961(4) provides:

"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

Plaintiff alleged in his complaint that "Defendant Bank and First Atlanta Corporation are an enterprise...." (Complaint, ¶ 18). Defendant argues that a group of corporations cannot be an "enterprise" within the meaning of RICO.

The court finds Defendant's assertion to be without merit. In reaching this conclusion, the Court follows the Second Circuit's decision in *United States v. Huber*, 603 F.2d 387 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). As that court reasoned,

[the] argument that a group of corporations cannot be an enterprise within the meaning of the statute stems from an overly rigid reading of the definitions contained in section 1961.... [The argument] makes nonsense of the statute. First, the language does not require that result. The definition of "enterprise" is a list beginning with the word "includes." This indicates that the list is not exhaustive but merely illustrative. Second, at least, where the enterprise is commercial, courts have consistently construed "enterprise" broadly in light of Congress' mandate that the provisions of Title IX of the Act "shall be liberally construed to effectuate its remedial purposes".... To view "enterprise" as excluding groups of corporations would make it too easy to avoid RICO's forfeiture sanction.

603 F.2d at 393–94. In support of its conclusion, the court notes that the Eleventh Circuit has held that a corporation may be simultaneously both the defendant and the enterprise under RICO. *United States v. Hartley*, 678 F.2d 961 (11th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014, —— U.S. ——, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1982).

### III. *Summary*

In summary, the court holds that the victim of a RICO predicate act has standing to seek damages under § 1964(c) for a § 1962(c) violation, but only where the predicate act is committed in pursuance of the affairs of a criminal enterprise. Only in this context does awarding treble damages to the victim of a crime serve a purpose contemplated by RICO.

Aside from the referenced standing requirement, there is no general requirement that a civil RICO plaintiff plead the defendant's association with organized crime. Further, a group of corporations can be an enterprise within the meaning of RICO.

A ruling on the Bank's motion to dismiss on the ground that Morosani lacks standing or has failed to allege injury by reason of a violation of § 1962(c) is hereby DEFERRED pending a hearing set for Thursday, March 22, 1984, at 2:00 p.m.